UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

DISTRICT OF NH
FILED

2023 JAN 16 P 10:10

24 HOUR DEPOSITORY

BRIAN JOHNSON,            )
                          )
*Plaintiff*               )
                          )   CIVIL ACTION NO.
   vs.                    )
                          )
RAYTHEON TECHNOLOGIES     )
CORPORATION,              )
                          )
*Defendant.*              )
                          )

## COMPLAINT

1. Mr. Brian Johnson
   2 Herrick Street
   Nashua, NH 03060
   (603) 557-4440

2. Raytheon Technologies Corporation
   1000 Wilson Blvd.
   Arlington, VA 22209
   (781) 522-3000

3. This Complaint is filed with this Honorable Court because federal question jurisdiction applies. (Diversity also applies.)

4. This is a whistleblower action arising out of the defendants' unlawful retaliation and termination of the plaintiff.

5. The Plaintiff, Brian Johnson ("Johnson"), is a natural person with a last and usual residence located in Hillsborough County, New Hampshire. Johnson is an honorably discharged "active-duty wartime or campaign badge veteran." (National Defense Service Medal and Global War on Terrorism Service Medal)

1

6. Johnson is defined as a "covered veteran" under Title 38, U.S.C., Part 3, Chapter 42, §4212. The plaintiff "is regarded as having an impairment" (disability) as defined by Title 42 U.S. Code §12102. As a "protected veteran" and an employee of a federal contractor, Johnson is entitled to all the rights and protections applicable to such employees under a multitude of state and federal laws.

7. As set forth below, the plaintiff, a former Senior Information Technology Specialist, held high-level Department of Defense security clearances for over 30 years. While working for the defendant (a federal defense contractor) plaintiff discovered security vulnerabilities that exposed critical nuclear weapons design information to potential theft by hostile actors.

8. Throughout 2018 and 2019 Johnson reported classified security concerns to management. Raytheon management did not take the reports seriously, and failed to mitigate very serious vulnerabilities. Eventually Johnson concluded that he had exhausted his internal options, and had to seek help from the federal government.

9. Johnson knew that the Defense Counterintelligence Security Agency is the federal agency authorized to investigate and address failure to comply with federal classified security regulations at Raytheon. He decided to make a "protected disclosure" to the D.C.S.A. Specifically- he intended to report classified security vulnerabilities and practices that constituted violations of laws, rules, and regulations related to federal contracts. (Title 41 U.S.C. §4712)

10. On 20SEP19 Johnson drove to the D.C.S.A. office in Andover MA. He knocked on the door and requested a meeting with the appropriate federal officials. Johnson was granted a meeting with Security Controls Inspector (M.W.) and the "Station Chief." These are D.o.D. officials responsible for investigating and correcting failures to meet federal security requirements at Raytheon.

11. Johnson explained his circumstances to the federal agents. He explained that Raytheon was failing to remediate classified security vulnerabilities, and retaliating against him for protected disclosures he made to other agencies or federal officials. The D.C.S.A. officials advised

Johnson to file a Title 10 U.S.C. §2409 "Whistleblower Reprisal Complaint" against Raytheon. Johnson assured them he would.

12. On 23SEP19 Johnson returned to work, and met with his manager (L.B.). Johnson admitted that he had met with the D.C.S.A. officials. There is no doubt that Raytheon management was aware Johnson had just made another protected disclosure.

13. The following day Johnson was formally reprimanded by Human Resources. He was ordered to sign Disciplinary Action Forms which wrongly accused him of inappropriate workplace conduct.

14. It's important to note that the "inappropriate conduct" described in the reprimands occurred months before. Raytheon did not find the "conduct" inappropriate at the time, but suddenly determined the "conduct" demanded formal punishment the day after learning Johnson had reported them to the federal agents.

15. Title 41 U.S.C. §4712 states that the legal burden of proof specified in Title 5 U.S.C. §1221 "shall be controlling" for the purposes of any proceeding to determine whether discrimination occurred.

16. Title 5 U.S.C. §1221 states that, "The employee may demonstrate that the disclosure or protected activity was a contributing factor in the personnel action through circumstantial evidence, such as evidence that… the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure or protected activity was a contributing factor in the personnel action."

17. This was the seventh time in two years that Johnson was involved in whistleblowing activity and Raytheon retaliated within 48 hours or less. (See document "*Unabridged Complaint.*")

18. Johnson followed through with his commitment to file the Title 10 U.S.C. §2409 "Whistleblower Reprisal Complaint" against Raytheon. The DoD assigned an investigator (D.F.) and a lawyer (J.P.) to assist him. Johnson also hired a private attorney.

19. Johnson sent messages to all three parties. He predicted that once Raytheon learned he had filed the federal complaint, it was likely Raytheon would wrongfully accuse him of misconduct.

Johnson expected this because unsubstantiated accusations of misconduct were a common means of reprisal that he had experienced at Raytheon many times.

20. On 07OCT19 Johnson worked a full day. While at work he received a document from the D.o.D. lawyer. It was a "release" form authorizing the D.o.D. to inform Raytheon that Johnson had filed a complaint against them. He signed the release form for J.P. and went home.

21. On 08OCT19 Johnson worked a full day, and returned home. He decided that due to the risk Raytheon would falsely accuse him of misconduct, it was too dangerous to return to work the next day.

22. On 09OCT19 Johnson utilized a "sick day." He then attempted to take an unpaid leave of absence from Raytheon for the rest of the year. He wrote to L.B. and asked him to provide a Leave of Absence Request Form. L.B. claimed he didn't know what an L.O.A. Request Form was. (Johnson did not believe L.B. because L.B. had signed an L.O.A. Request Form for Johnson the previous year). Johnson suspected L.B. was forcing him to return to the office for nefarious purposes.

23. On 10OCT19 Johnson returned to the office. As predicted, L.B. raised an unsubstantiated accusation of misconduct. L.B. intimated that he was considering charging Johnson with timecard fraud.

24. Johnson had learned to expect false accusations, and was not intimidated. He proceeded with his reprisal complaint. The D.o.D. lawyer J.P. approached the Raytheon lawyer J.K. and proposed Alternative Dispute Resolution with the D.o.D. Raytheon accepted.

25. D.o.D. lawyer J.P. explained the details of the D.o.D. Attorney General complaint to Raytheon lawyer J.K. In the complaint, Johnson specifically named three Raytheon managers who had retaliated against him- Ethics Director S.W., Security manager J.L., and IT manager L.B. as well.

26. Raytheon responded just as Johnson predicted. The three managers named in Johnson's whistleblower reprisal complaint launched a formal timecard fraud investigation against him.

27. The false charges were made by L.B., who claimed Johnson conspired to steal two hours of pay from the US government on 07OCT19. It's important to note that 07OCT19 was the day Johnson authorized the D.o.D. lawyer to divulge that he had filed the federal complaint to Raytheon.

28. It was absurd to allege Johnson would bill the government for hours he did not work during the period when he was warning his lawyers that Raytheon was scrutinizing his behavior, searching for any pretext to charge him with misconduct.

29. Furthermore- Johnson was struggling to take the rest of the year off with no pay. He was willing to lose tens of thousands of dollars to deprive Raytheon of the opportunity to falsely charge him with timecard fraud. The allegation that Johnson committed timecard fraud at that exact time is ludicrous.

30. In November of 2019 Ethics Director S.W. and Security manager J.L. conducted a sham "Timecard Fraud Investigation." They concealed their determination and left any potential punishment "on the table" while the Alternative Dispute Resolution process between Raytheon and the D.o.D. played out.

31. Meanwhile, Johnson executed his usual work duties, which included troubleshooting and repairing computer problems. In December he was approached by two of his peers (E.K. and Z.P.) who asked Johnson to help them troubleshoot a highly complex I.T. problem.

32. Johnson agreed to assist, but was unable to enter the locked classified area because he had not been granted access. E.K. and Z.P. opened the door for Johnson and escorted him into the classified area.

33. Johnson observed the troubleshooting process employed by E.K. and Z.P. This is when Johnson observed that Raytheon was violating federal classified security standards once again.

34. Johnson knew he could not report the violation to Raytheon Security without retaliation; therefore he made another protected disclosure by contacting M.W. at the D.C.S.A. Andover field office.

35. The following morning Johnson visited the classified area where the violations occurred. He was surprised to find that M.W. was conducting an investigation into his complaint, and was surrounded by Raytheon Security managers.

36. Johnson silently observed as Raytheon Security managers misled the federal official. Johnson perceived they were succeeding in convincing him that no legitimate violation occurred. That is when Johnson stepped forward and challenged the disinformation. Johnson separated M.W. from the crowd and substantiated the seriousness of the problem he had reported.

37. After demonstrating the violation Johnson asked M.W. "Did I report a legitimate classified security concern?" M.W. replied "yes" and departed the area.

38. Immediately after the federal inspector left the building (if not sooner) Raytheon revoked Johnson's access to classified information! It was yet another prima facia case of whistleblower reprisal.

39. Johnson appeared at the office of the Raytheon Andover Facility Security Officer (H.B.) and asked H.B. why he revoked his clearance. H.B. responded, "Because you are an insider threat." (18 U.S.C. § 1513(e))

40. There was nothing Johnson could do about the revocation of his clearance… Alternative Dispute Resolution was in the hands of the lawyers as well… so Johnson decided to focus on fighting the false timecard fraud charges.

41. On 06NOV19 Johnson drove to the Defense Contract Management Agency office in Tewksbury MA. He entered the building and requested to meet with the most senior government official available. Johnson was allowed to meet with C.M.G., who was then the Deputy Director of the D.C.M.A.

42. C.M.G. was a federal employee responsible for contract oversight at Raytheon, so Johnson proceeded to disclose violations of laws, rules, or regulations related to the federal contracts. (Title 41 U.S.C. §4712)

43. Johnson told C.M.G. "Raytheon has charged me with fraudulently billing the United States Government. I am here to request that you conduct a full investigation into my labor charging

6

history." Johnson wanted the federal investigation because he knew it would exonerate him, and simultaneously prove that S.W. was manufacturing fake timecard fraud charges because he was a whistleblower.

44. C.M.G. asked Johnson "who" was behind the false accusation. Johnson informed her that Raytheon Ethics Director S.W. was responsible. C.M.G. recognized the name S.W. and stated that Raytheon has a history of making false timecard fraud charges. She then provided Johnson with the contact information for the Defense Criminal Investigative Service in Boston. (Evidently the magnitude of the problem with Raytheon was so serious that C.M.G. had already established communications with D.C.I.S. agents.)

45. After meeting with C.M.G. Johnson called the D.C.I.S. Two federal agents arranged to meet with Johnson and interview him. Johnson told the agents that the Raytheon managers had been abusing their authority to prevent the D.o.D. from substantiating classified security violations on the federal contracts.

46. Furthermore- the efforts were a blatant conspiracy between several Raytheon managers. These managers had submitted numerous false official statements to the federal government, all of which could reasonably be expected to "fool" the government into revoking Johnson's clearance. (The "timecard fraud" allegation was the most recent example of Raytheon lying to the federal government at that time.) The D.C.I.S. agents thanked Johnson for his statement and departed.

47. The A.D.R. negotiations between the D.o.D. and Raytheon did not yield any positive developments. Raytheon demanded to know "How much money" Johnson wanted to settle the complaint. Despite the objections of his lawyer, Johnson responded that he would settle the case for <u>one dollar</u>, provided that Raytheon admitted their managers had been lying to the federal government, and the defamatory Incident Reports they submitted (about Johnson) were fabrications.

48. Raytheon refused the terms of the agreement, and fired Johnson instead. (January 17, 2020.)

7

49. Raytheon lawyer J.K. demonstrated complete contempt for the D.o.D. lawyer and the federal complaint. He didn't even notify J.P. that Raytheon fired Johnson while the D.o.D. Inspector General complaint was still active! (Johnson notified J.P. a month later.)

50. The termination was the ultimate act of reprisal, but not the last. In January of 2020 Raytheon Security sent another false and deceptive Incident Report to the JPAS federal security clearance database. The I.R. falsely states, "Johnson falsified his official timecard on October 7 and 8 2019, to include charging hours against the US Government contracts on days for which he did not perform work."

51. Please recall that the initial accusation was that Johnson mischarged 2 <u>hours</u> of pay on 07OCT19. The Incident Report Raytheon filed in 2020 falsely claims Johnson mischarged 2 <u>days</u> of pay.

52. The Raytheon Incident Report further states, "This matter was also reported to the Defense Audit Agency." It is important to note that Johnson had completed 19 years of federal service prior to working for Raytheon. Johnson only needed one more year of federal service to be eligible for a federal pension.

53. Individuals who commit timecard fraud are barred from federal service for <u>life</u>. It appears Johnson will never earn the final year he needs to reach the 20-year mark, because the Raytheon Ethics Director maliciously charged him with timecard fraud.

54. Johnson continues to suffer damages due to the false Incident Reports that Raytheon submitted to JPAS.

55. Prior to being wrongfully terminated, Johnson enjoyed a 30-year career as a defense contractor. Because Raytheon "flagged" Johnson's security clearance, he has been unable to secure employment as a defense contractor.

56. Numerous employers have refused to hire Johnson based on the false and misleading Incident Reports Raytheon has placed in his federal record. Such incidents continue to occur in 2022.

## PRAYERS FOR RELIEF

Plaintiff respectfully requests relief in accordance with all applicable federal laws. His claims include but are not limited to claims that his termination and the hostile work environment he endured violate Title 10 U.S.C. § 2409, 15 U.S.C. § 78u-6(h)(1)(A), 18 U.S.C. § 1513(e), Title 10 U.S.C. §4701, Title 41 U.S.C. §4712, Title 5 U.S.C. §1221, Title 29 C.F.R. (ADA) Part 1630, etc.

A. Enter judgement against the defendant in such amount as this Honorable Court deems proper and just;

B. Award the plaintiff compensatory damages and lost wages in the amount according to proof at trial;

C. Award the plaintiff compensatory damages for emotional distress, loss of professional reputation, and the anticipated loss of lifetime earnings;

D. Award the plaintiff punitive damages according to proof;

E. Award the plaintiff reasonable attorney's fees, costs, and interest allowed by law. Such fees will be reported in Box 14 of any Form 1099, and for which the agreement will state that it consists of fees and costs under Public Law 108-357, section 703(e)(17) and (18), of the Civil Rights Tax Relief Act, 26 U.S.C. § 62(e);

F. Expungement of the plaintiffs' personnel records.

G. Require Raytheon Technologies to notify the Department of Defense, D.o.D. Central Adjudication Facility, Defense Counterintelligence Security Agency, Defense Office of Hearings and Appeals, U.S. Office of Personnel Management, and the Defense Contract Management Agency, that their managers and representatives have submitted false and deceptive statements about the plaintiff. And,

H. Grant all such further relief as may be equitable and just.

Date: 15 JAN 23      Respectfully Submitted, *Brian J. Johnson*
Brian J. Johnson (Plaintiff pro se)
2 Herrick Street
Nashua, NH 03060
(603) 557-4440